UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FADI SABA,

          Plaintiff,

    v.

UNISYS CORPORATION,

          Defendant.

Case No.  14-cv-01310-WHO

**ORDER GRANTING UNISYS'S MOTION FOR SUMMARY JUDGMENT AND DENYING SABA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 75, 76

Plaintiff Fadi Saba filed suit against Unisys Corporation ("Unisys"), his former employer, after he was terminated in 2013.  He brings two causes of action for wrongful termination in violation of a fundamental public policy, arguing that Unisys terminated him (i) in retaliation for a prior lawsuit that he brought against Unisys for California Labor Code violations and (ii) for reporting Unisys's concealment of its failure to back up files for one of its clients, a government contractor that was subject to a hold order from the U.S. Department of Justice.  He also states a cause of action for wrongful termination in violation of the California Family Rights Act ("CFRA"), arguing that Unisys terminated him in retaliation for taking family leave on several occasions, and a claim under California law for intentional infliction of emotional distress ("IIED") based upon Unisys's conduct in terminating him.

Unisys gives three reasons for terminating Saba: he was unable to work for one of two main customers of the group within Unisys to which he was assigned; the group's other main customer reduced its contractual requirements from Unisys so that approximately 2 rather than 5 full-time employees were needed to service it; and Unisys itself suffered a financial reversal and terminated 54 employees, including Saba, in a reduction in force.   Saba offers no evidence to dispute those reasons, and his evidence of pretext is weak to non-existent. Accordingly, I GRANT Unisys's motion for summary judgment.  Although Saba established a prima facie case for his

United States District Court
Northern District of California

causes of action based upon retaliation for various protected behavior, Unisys met its burden of showing that it had a legitimate reason for terminating him.  Construing the facts in the light most favorable to Saba, there is no evidence from which a jury could infer that Unisys's termination of Saba was a pretext for retaliating against him in violation of the law.  In addition, Saba's IIED claim is barred by the exclusive remedy provisions of California workers' compensation law.  Because I GRANT Unisys's motion for summary judgment, I DENY as moot Saba's motion for partial summary judgment on two of Unisys's affirmative defenses based upon "after-acquired evidence" and "unclean hands."

## BACKGROUND[1]

### I. SABA'S WORK AT UNISYS AND FIRST FOUR REQUESTS FOR FAMILY MEDICAL LEAVE

Saba began working for Unisys in 2003.  Saba Decl. ¶ 4 (Dkt. No. 96).  At that time, he lived and worked in Pennsylvania.  *Id.* ¶¶ 2-4.  Since he began work, Saba has always worked in positions relating to data services and retention.  *Id.* ¶ 4.  In 2007, Saba moved from Pennsylvania to California, continuing to work remotely for Unisys.  *Id.* ¶ 6.

Between 2007 and 2009, Saba's supervisor was Robert Claycomb.  *Id.* ¶ 6.  Around July of 2009, Rachael Hartzler replaced Claycomb as Saba's interim supervisor.  *Id.*  Hartzler reported to John Buckner, the Manager of the Global Windows group.  *Id.*

In 2009, Saba asserts that he attempted to obtain family medical leave for the birth of his third child, who was born on October 29, 2009.  *Id.* ¶ 7.  Saba "prepared the required documentation to obtain family medical leave" and forwarded it to Hartzler for approval.  *Id.* ¶ 7.  According to Saba, this request was ignored, and Human Resources later claimed that it had no copy of his leave request.  *Id.*  He did not take the leave.

In May of 2010, Donald Capbell replaced Hartzler as Saba's supervisor.  *Id.* ¶ 8.  Capbell also reported to Buckner.  *Id.*  Saba attempted to take leave in April of 2011, after his child was injured in an accident.  *Id.* ¶ 10.  Buckner instructed Saba not to take family medical leave, but

---

[1] For the purposes of Unisys's motion for summary judgment, I consider all disputed issues of material fact in the light most favorable to Saba.

instead to take vacation time.  *Id.*  Again, Saba ultimately did not take any leave.  *Id.*

Hartzler became Saba's supervisor for the second time in 2011, and he was assigned to her group between May and September of that year.  *Id.* ¶ 11.  Buckner told Saba that the transfer was due to his superior skills in with automation, primarily scripting.  *Id.*  Buckner also testified that he moved Saba to a group where he was needed.  Buckner Depo. 32:20-33:7 (Dkt. No. 100).  Around this time, Saba told his supervisors that he planned to take family medical leave in February of 2012 for the birth of another child.  Saba Decl. ¶ 11; Saba Ex. 7.[2]

In February of 2012, Saba submitted the application for family medical leave.  Saba Decl. ¶ 14.  He initially requested partial leave of two hours per day for one month.  *Id.*; Saba Ex. 11.  Hartzler did not want Saba to take partial leave, and instead instructed him to take full days off.  Saba Decl. ¶ 15; Saba Ex. 12.  In an email to Saba, she stated that "[w]orking a couple hours per day won't allow you the full separation from work responsibilities that Family Medical Leave should provide, and it's not necessary given the coverage already in place."  Saba Ex. 12.  Saba responded to Hartzler's email, stating that "while I appreciate your offer that I consider full days off . . . I feel more comfortable with my request as I have submitted it."  Saba Ex. 13.  In an email to a supervisor, Hartzler asked whether "it's within my rights as [Saba's] manager to deny partial and only allow full family leave."  Saba Ex. 15.  Ultimately, Saba adjusted his request to four hours off per day, and his request was approved by Human Resources.  Saba Decl. ¶ 15; Saba Exs. 14, 16.

In July of 2012, Saba told Hartzler that he planned to take the remainder of his family medical leave in January of 2013.  Saba Decl. ¶ 17; Saba Ex. 19.  After submitting a formal leave request, Saba's request was granted in late 2012.  Saba Exs. 20, 21.  According to Saba, Hartzler told him that taking the leave "would probably make it hard for you to get involved" in future work.  Saba Decl. ¶ 17.  Saba took his approved family medical leave in January of 2013.  *Id.* ¶ 19.  According to Hartzler's deposition, Hartzler never took family medical leave while working at Unisys and no one other than Saba had taken formally approved family medical leave.  Hartzler

---

[2] Saba's exhibits 1-39 are in ECF Dkt. No. 99; exhibits 40-48 are in Dkt. No. 100.

United States District Court
Northern District of California

1    Depo. 52:17-19, 53:20-25 (Dkt. No. 100).

2    **II.  SABA'S WORK WITH THE CITY OF MINNEAPOLIS AND TASC**

3        Hartzler's group ("Core Team 3"), to which Saba was assigned, worked primarily with two

4    clients.  Hartzler Decl. ¶ 7 (Dkt. No. 82).  The parties do not dispute that one client, the City of

5    Minneapolis (the "City"), required employees to pass a background check before they could work

6    with it.  *See id.* ¶ 10.  Saba asserts that he completed a questionnaire for the City in 2011, but that

7    the City misplaced it and required him to submit a second questionnaire in January 2012.  Saba

8    Decl. ¶¶ 13.1-13.2.  The City then claimed the second questionnaire was incomplete, and sent

9    Saba an encrypted email that allegedly contained personal, confidential information.  *Id.* ¶ 13.2.

10   Saba was particularly upset by this because he had been a victim of identity theft in the past.  *Id.*

11   ¶¶ 13.3-13.4.  Without a completed questionnaire, the City refused to process Saba's clearance

12   further, *see* Saba Decl. ¶ 13.6, and Saba did not receive the clearance, rendering him unable to

13   work with the City.

14       Saba sent several emails to Hartzler and Unisys's Human Resources department, discussing

15   his difficulties in obtaining security clearance for the City and his displeasure at the City's

16   treatment of his confidential information.  *Id.* ¶ 13.6; Saba Ex. 9, 10.  Given the disclosure of his

17   private information, Saba requested that Unisys change his name on its records.  Saba Ex. 10.

18   Hartzler denied that request.  Saba Decl. ¶ 16.  Saba ignored her denial and changed his name in

19   Unisys's records anyway.  *Id.*

20       Core Team 3's other client, with whom Saba primarily worked, was "TASC."  TASC is a

21   government contractor that provides services to a number of government agencies, including the

22   Department of Defense.  Hull Depo. 35:3-14 (Dkt. No. 100).  Between September of 2012 and his

23   termination, Saba's job duties included weekly "incident calls" with TASC.  Saba Depo. at 332:4-

24   25 (Dkt. No. 87-1).  An "incident" was a technical issue that Unisys employees were assigned to

25   resolve.  *Id.* at 324:4-6.

26       Saba noticed in August of 2012 that TASC data was not being backed up as it was supposed

27   to.  Saba Decl. ¶ 22.  He was told by Brian Socolofsky and Ezra Gray, who were part of Unisys's

28   backup team, to tell TASC that the backup team was "working on it," although Saba believed that

they were not doing anything.  Saba Depo. 242:18-243:19.   He sent an email to several people, including Hartzler, stating that the files "simply do not have restore revisions for the needed dates."  Saba Ex. 28.  He repeated this opinion in an email sent in January of 2013.  Saba Ex. 29. Although Saba was assigned to discuss technical issues with TASC, he claims that he was instructed not to disclose the extent of the problem.  Saba Decl. ¶ 24.  Instead, the Unisys backup team told Saba to inform TASC that Unisys was "working on it."  *Id.*  In February of 2013, Saba sent an email that discussed the backup failure to a group of recipients, including Hartzler and the backup team.  *See* Saba Ex. 31 ("we won[']t be able to restore any files from the T:\drive and due to the limitations of DPM, this is no surprise and was essentially predicted.  That's an ugly truth.").

TASC received a legal hold order from the DOJ in the spring of 2013.  Hull Depo. 53:5-55:10.  TASC informed Unisys of the hold on March 20 (Saba testified that he was not aware of whether TASC was asked to produce documents in response to the legal hold).  Saba Depo. 254:2-5; Hull Depo. 2 at 91:9-93:18 (Dkt. No. 87-3).  Saba testified that he did not know whether anyone from Unisys told anyone at TASC that data had been lost.  Saba Depo. at 263:16-25.  However, he stated that other colleagues had raised concerns to Hartzler, including Socolofsky.  *Id.* at 387:18-388:3.

Saba also expressed his concerns to Hartzler, who first told him to tell TASC that they were working on the problem, and then told him to tell TASC that there was no problem going forward and that they were fixing a prior one.  Saba Depo. 399:11-400:25.  Saba said to Hartzler that he believed he was required to report the backup failure to TASC because of the DOJ hold. Saba Decl. ¶ 25.  He stated that Unisys's actions were "if not illegal, 'at least shady.'"  *Id.*  In his deposition, Saba clarified that in his view, the unethical action was the act of "[t]aking money from a customer for months and not providing it the service, knowing of a DOJ hold and failing to put the customer in compliance with that hold."  Saba Depo. 413:15-18.  He said that he thought that he contacted Unisys's ethics office regarding the issue, but did not call the ethics help line or official email.  *Id.* at 416:15-417:25.

In an IM conversation with several employees on April 30, 2013, Helen Baker, who was

United States District Court
Northern District of California

1 the highest level Unisys employee working directly with TASC on Core Team 3, instructed

2 several Unisys employees, including Saba, that "[t]here is a legal issue at hand and our general

3 counsel has directed that we cease all written communication with TASC related to storage issues

4 and data backups & recoveries." Saba Ex. 32; Hartzler Decl. ¶¶ 33-36.  She continued, "Please do

5 not engage in discussions with TASC related to what restores are available/not available." Saba

6 Ex. 32.

7      In late 2012 to early 2013, TASC modified its contract with Unisys.  *See* Dkt. No. 79-3,

8 Ex. 7.  Because of budget cuts, TASC "needed to dramatically reduce the cost it was paying

9 Unisys for services."  Levenson Decl. ¶ 8 (Dkt. No. 79).  This in turn reduced the service that

10 Unisys needed to provide it.  *Id.* ("The ultimate conclusion was, Unisys needed a lot less labor

11 (i.e., personnel) to perform TASC work going forward because of the contract changes.").

12 Hartzler and Jeff Levenson, who also worked with TASC, calculated that the changed contract

13 would reduce the need for "full-time equivalent" personnel from 4.82 to 1.89.  *Id.* at 11.

14   **III. SABA'S PERFORMANCE REVIEWS**

15      Saba's 2009 review, written by Claycomb, described him as "fully effective," and stated

16 that "Fadi has made some exceptional contributions to our organization . . . Fadi is always willing

17 to put in the time necessary to perform the tasks that need to be done, and does so without

18 complaint." Saba Ex. 4.  In Saba's 2010 performance review, Capbell described Saba's

19 performance as "fully effective," and rated him as "advanced" or "proficient" in all categories.

20 Saba Decl. ¶ 9; Saba Ex. 5.

21      Saba's 2011 performance review was prepared by Hartzler and did not rate Saba due to his

22 limited time working in Hartzler's group, though it cited to a mid-2011 interim review that rated

23 Saba as "achieving."  Saba Decl. ¶ 12; Saba Ex. 8.  It also stated that "[u]nfortunately Fadi has not

24 completed the background check required in order for him to support his team's other primary

25 customer, City of Minneapolis.  This is a critical part of his role and has affected the team's

26 workload balance." Saba Ex. 8.  The review added that Saba "failed to submit the paperwork

27 required for completion of the [City] background check." *Id.* It also noted Saba's "immense

28 difficulty following administrative procedures and taking direction from managers and corporate

1   administrators." *Id.* Finally, the review stated that Saba "struggled with letting go of the tasks

2   from his previous job despite regular meetings, coaching and finally direct orders from John

3   Buckner." *Id.* Hartzler expressed her concern about Saba's failure to complete the City's

4   background check to Bucker in a January, 2012 email, stating that "I don't want him on my team

5   after hearing about the games he's been playing for the past six months." Hartzler Decl. Ex. 30.

6        In an instant message conversation in November of 2012, Saba complained to Buckner that

7   he did not like working with Hartzler. Saba Ex. 22. Saba stated that "it really feels like [Hartzler]

8   has a personal issue with me or just doesn't like me for some reason." *Id.* In response to Saba's

9   request to work under a different manager, Buckner stated, "I do have some reqs open and we

10   have a second shift Incident team position to fill[.] I don't know if you're willing to work second

11   shift or not[.]" *Id.* Saba asked Buckner to send him the information, which Buckner promptly did.

12   *Id.* When Saba asked if there were other positions open Buckner stated, "[Y]es you should be able

13   to search on all open reqs." *Id.* Saba claims that "[a] few months later, I saw official

14   announcements of new hires were placed in two [] open positions that Mr. Buckner had not made

15   available to me." Saba Decl. ¶ 18; Saba Exs. 23, 24.

16        Saba's 2012 performance review, prepared by Hartzler, rated him as "not achieving." Saba

17   Ex. 26. It stated that Saba "missed important organization and procedural announcements" and

18   did not "follow[] through on his assigned work, [came] to meetings unprepared, and [did] not

19   provid[e] thorough and timely updates for the cases he was working." *Id.* It also said, "It appears

20   the majority of the work he handled he performed effectively and accurately, but due to the

21   number of escalations and complaints I received, I don't consider [the "customer service"]

22   objective to be met." Although the report cited an interim review that rated Saba as "achieving"

23   and described Saba's "ability to take on more complex work tasks," the report also discussed

24   Saba's failure to attend meetings and lack of preparedness. *Id.*

25   **IV. SABA'S MAY 9, 2013 EMAIL AND TERMINATION**

26        In late 2012, Saba learned that his wife, Parvaneh Alquero, had been diagnosed with

27   cancer. Saba Depo. 305:11-306:25. Saba claims that Alquero is his wife under Pennsylvania

28   common law: the two married in 2002, "solemnized" their marriage in Mexico, owned property

together, and held one another out to be man and wife.  Saba Depo. 76:5-25; Saba Decl. ¶ 2.

Alquero was always enrolled as Saba's wife in his employee benefits plan.  Saba Decl. ¶ 3; Saba

Ex. 2.  At the same time, Saba admitted during his deposition that he was also married to Chih Lin

in California.  Saba Depo. 77:1-18.  Saba claims that he married Lin in 2010.  *Id.* at 79:13-17.

Although Saba's marriage to Alquero was a common law marriage, for which he had no license,

Saba has a marriage license for his marriage to Lin.  *Id.* at 94:20-95:11.  Saba asserts that he has

not ever obtained a divorce from Alquero and maintains that he was married to Alquero and Lin at

the same time.  *Id.* at 76:19-25, 79:18-20.

On May 9, 2013, Saba sent an email to Gary Greene, who worked for Unisys's Human

Resources department, and Christopher Rusek, who Saba believed to be Unisys's in-house

counsel.  *See* Saba Decl. ¶¶ 26-27; Greene Decl. ¶ 3 (Dkt. No. 86); Saba Ex. 33.  He said that he

expected to take further family medical leave to assist his wife, Alquero, stating in part, "Due to

wife sickness, I would like to be with her for medical treatment in two weeks (starting May 21 or

22)."  Saba Decl. ¶ 26; Saba Ex. 33.  He did not email Hartzler, his direct supervisor, due to his

prior conversations and hostile relationship with her.  Saba Decl. ¶ 26.

The email also explained Saba's concerns about the TASC back-up problem.  Saba Ex. 33.

Saba wrote, "I do not want to be unethical in my responses to the customer and though backups

are the responsibility of another team, I am having to report weekly on outstanding issues

(including backups).  I am concerned about the DOJ hold and I do not want to be covering up

failures to meet legal requirements . . . I also feel it puts me in a possible legal predicament."  *Id.*

Saba later explained that this "legal predicament" was related to a prior settlement with

Unisys which prevented him from saying anything negative about the company.  Saba Depo.

412:9-23.  Saba's email also expressed his belief that due to this prior lawsuit, he was being

retaliated against and "singled out."[3]  Saba Ex. 33.  Saba's email concluded that "[i]f these items

---

[3] In April of 2012, Saba filed a class action lawsuit against Unisys that alleged, among other
causes of action, failure to reimburse for business-related expenses, failure to pay waiting time
penalties, and inaccurate wage statements.  Saba Ex. 25; Saba Depo. 172:1-10.  The parties
entered into a settlement agreement, which Unisys signed in January 2013 while Saba was taking
family leave.  Saba Decl. ¶ 20; Saba Ex. 41.

United States District Court
Northern District of California

United States District Court
Northern District of California

can't be discussed and resolved so that we can have a healthy relationship for the next ten years, I ask for arbitration as per our agreement signed in January." *Id.*

There is some doubt whether anyone at Unisys received this email. For his part, Saba states that the email did not "bounce back" to him. Saba Decl. ¶ 27. In his deposition, he stated that he received a response from Rusek that Rusek was no longer with the company and that inquiries should be directed to Joe Teklits. Saba Depo. 268:13-17. Saba did not speak to Teklits until after his termination. *Id.* at 268:22-269:10. After receiving no response to the email, Saba testified that he did not recall whether he provided any other documents to request time to care for Alquero. *Id.* at 323:7-16.

Unisys asserts that Greene, the other person to whom Saba says he sent the email, never received it. Greene Decl. ¶ 14. Unisys provided evidence that the email was never sent from Saba's email account or received by Greene's. Ellis Decl. ¶ 5 (Dkt. No. 120).

Saba contends that after he returned to work in early 2013, he was assigned lower level work and was ignored by Hartzler when he requested information. Saba Decl. ¶ 21. On May 15, 2013, Unisys HR Directors and Associate General Counsel sent an internal memo which provided that due to a decline in overall revenue of 13 percent, Unisys would make reductions in its workforce. Dkt. No. 86-6. Unisys selected 54 employees for layoff. Wang Decl. ¶ 15 (Dkt. No. 80).

Saba was selected to be laid off in 2013, effective June 6. Hartzler Decl. ¶ 42; Saba Exs. 36, 39. A memo prepared by Hartzler that detailed Unisys's reasons for terminating Saba stated that "[d]ue to Fadi's restriction in supporting [the City], his ability to contribute toward the team's workload is significantly hampered." Saba Ex. 34; Hartzler Depo. 243:9-17. In addition, it noted that Saba was the "junior of the two Core Team 3 employees who primarily support TASC, Helen Baker being the other, with less expertise than Helen in Active Directory, VMware, and Print Server management." Saba Ex. 34. It also cited the recent contractual change with TASC that caused a reduction in work for the team and made Saba less needed. *Id.* The memo concluded: "In conjunction with the recent contractual change with TASC, and in line with company cost savings measures, Fadi has been selected for layoff as his reduction will have the least impact on

1 the team's ability to deliver client support." *Id.*

2   Saba filed the complaint in the present action on March 21, 2014. After the parties filed

3 cross motions for summary judgment, I heard argument on June 24, 2015.

### LEGAL STANDARD

5   A court will grant a motion for summary judgment where the pleadings, discovery and

6 affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled

7 to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute as to a material fact is genuine if

8 there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See*

9 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the moving party will have

10 the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier

11 of fact could find other than for the moving party." *Noriga v. Ahmed*, No. CV 12-0889 WHO

12 (PR), 2013 WL 3461931, at *1 (N.D. Cal. July 9, 2013). Where the nonmoving party will have

13 the burden of proof at trial, the moving party must demonstrate only "that there is an absence of

14 evidence to support the nonmoving party's case." *Id.* (internal quotations omitted).

15   If the moving party meets its initial burden, the nonmoving party must then go beyond the

16 pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Id.*; FED. R.

17 CIV. P. 56(a). The court will consider only material facts and not "factual disputes that are

18 irrelevant or unnecessary." *Anderson,* 477 U.S. at 248. In order to prevail, the nonmoving party

19 must demonstrate with reasonable particularity that the evidence precludes summary judgment.

20 *Noriga*, 2013 WL 3461931, at *1. Absent such a showing "the moving party is entitled to

21 judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal

22 citations and quotations omitted).

### DISCUSSION

24   The heart of this ruling is that Saba fails to raise a triable issue of fact that he was

25 terminated in retaliation for various protected acts. I discuss my reasoning in Section C, below.

26 Before I get there, however, I address why his intentional infliction of emotional distress claim is

27 barred, regardless of the merits of the other causes of action, and why he exhausted administrative

28 remedies under California Government Code section 12962. After concluding my analysis of

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Unisys's motion, in Section II I briefly discuss Saba's motion for partial summary judgment,

2    which is now moot because I am granting Unisys's motion.

3    **I. UNISYS'S MOTION FOR SUMMARY JUDGMENT**

4        **A.   Saba's IIED Claim is Barred by Workers' Compensation Exclusivity Provisions**

5            Saba's fourth cause of action pleads intentional infliction of emotional distress arising

6    from his termination and the other allegedly malicious acts by the defendants.  *See* Compl. ¶¶ 49-

7    53.  Unisys argues that this claim fails because (i) a termination decision cannot support a claim

8    for IIED "even if improper motivation is alleged," (ii) Saba did not present any evidence of

9    medical treatment for his emotional suffering; and (iii) workers' compensation exclusivity

10   provisions preempt his claim.  Unisys Mot. 23-24 (Dkt. No. 76).  Saba responds by asserting that

11   triable issues of emotional distress exist because his claim depends upon violations of express

12   statutes or fundamental public policies and workers' compensation exclusivity does not apply.

13   Saba Oppo. 24 (Dkt. No. 95).

14           Under California law, an employer must pay workers' compensation "without regard to

15   negligence . . . for any injury sustained by his or her employees arising out of and in the course of

16   the employment."  CAL. LAB. CODE § 3600(a).  When an employee is covered by workers'

17   compensation, "the right to recover compensation is, except as specifically provided in this section

18   and sections 3706 and 4558, the sole and exclusive remedy of the employee or his or her

19   dependents against the employer."  CAL. LAB. CODE § 3602(a).  The parties do not dispute that

20   Saba was covered by workers' compensation and thus potentially covered by the exclusivity

21   provision.

22           The relevant question is whether the workers' compensation provision covers Saba's

23   claims for IIED.  Under one of the primary cases establishing such liability, the California

24   Supreme Court has stated:

25               We have concluded that, when the misconduct attributed to the
                 employer is actions which are a normal part of the employment
26               relationship, such as demotions, promotions, criticism of work
                 practices, and frictions in negotiations as to grievances, an employee
27               suffering emotional distress causing disability may not avoid the
                 exclusive remedy provisions of the Labor Code by characterizing
28               the employer's decisions as manifestly unfair, outrageous,

harassment, or intended to cause emotional disturbance resulting in disability.

*Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 160 (1987).  It concluded that where "[t]he basis of compensation and the exclusive remedy provisions is an injury sustained and arising out of the course of employment . . . and [] the essence of the wrong is personal physical injury or death, the action is barred by the exclusiveness clause no matter what its name or technical form if the usual conditions of coverage are satisfied."  *Id.*

The cases on which Saba relies provide little support for his argument.  He cites to *Livitsanos v. Superior Court* to argue that where an employer's conduct violates public policy, workers' compensation exclusivity does not bar a claim for IIED.  Saba Oppo. 24.  In *Livitsanos*, the court concluded that an IIED claim alleging purely emotional injury fell within the workers' compensation exclusivity provision.  2 Cal. 4th 744, 754 (1992).  Saba points to the court's passing remark that exclusivity may not apply where "the employer's conduct [] contravenes fundamental public policy."  *Id.* at 754-55.

In support of this "public policy" exception to workers' compensation exclusivity, the *Livitsanos* court cited *Tameny v. Atl. Richfield Co.*, a case that acknowledged the "propriety of a tort remedy when an employer's discharge of an employee contravenes the dictates of public policy."  *Id.*; *Tameny*, 27 Cal. 3d 167, 177 (1980).  *Tameny* discussed neither workers' compensation exclusivity provisions nor claims for IIED, but retaliation in violation of public policy.  *Tameny*, 27 Cal. 3d 167.

The California Supreme Court resolved the question at issue here in *Miklosy v. Regents of Univ. of California*, 44 Cal. 4th 876 (2008).  There, the plaintiff brought claims for wrongful termination in violation of public policy and whistleblowing retaliation, as well as for IIED based upon the same conduct.  *Id.* at 884.  The court rejected an argument similar to Saba's and distinguished the cases that he cited – *Shoemaker v. Myers* and *Livitsanos*.  It stated that "[t]he exception for conduct that 'contravenes fundamental public policy' is aimed at permitting a *Tameny* action [for wrongful termination in violation of public policy] to proceed despite the workers' compensation exclusive remedy rule."  *Id.* at 902-03.  It found that the IIED claim was barred by workers' compensation exclusive remedy provisions.  *Id.* at 903; *see also Yau v. Santa*

1    *Margarita Ford, Inc.*, 229 Cal. App. 4th 144, 162 (2014).

2         The same reasoning applies here.  Saba's claims are identical to those in *Miklosy*.  The

3    cases he cites prevent his first two causes of action, which are *Tameny* claims, from being barred

4    by workers' compensation.  A public policy exception does not prevent his IIED claim from being

5    barred by workers' compensation exclusivity.  Accordingly, Unisys's motion for summary

6    judgment on Saba's fourth cause of action is GRANTED.

7    **B.   Saba is not Barred from Bringing the CFRA Claim Under California Government
           Code Section 12962**

8         The parties dispute whether Saba failed to properly exhaust his administrative remedies

9    under California Government Code section 12962, which would bar his third cause of action.

10   Unisys argues that Saba did not timely serve his right to sue letter and DFEH complaint within the

11   60-day period set forth in section 12962(b)-(c).  Unisys Mot. 13.  Saba counters that "[s]ervice of a

12   *noninvestigatory* DFEH complaint and right to sue letter is not jurisdictional" and that because his

13   complaint was not "investigatory" he did not need to comply with the 60-day limitation.  Saba

14   Oppo. 16.

15        Saba relies upon *Wasti v. Superior Court*, which discussed the administrative requirements

16   of section 12962 at issue here.[4]  In *Wasti*, an unrepresented plaintiff filed an administrative

17   complaint seeking a right-to-sue letter with the DFEH, which the DFEH issued two days later.

18   140 Cal. App. 4th 667, 670 (2006).  Although the plaintiff timely filed her civil case within the

19   one-year statute of limitations, she did not serve the defendant with the administrative complaint

20   that she filed with the DFEH.  *Id.* at 670-71.  The court concluded that "Government Code section

21   12962 only imposes a service requirement upon FEHA claims that are submitted to the

22   Department for 'investigation.'"  *Id.* at 670.  It found that the statute was "intended to eliminate

23   the service requirement where an employee opts to seek a right-to-sue letter" and found that the

24

25   ───────────────
     [4] This states:  "The department shall cause any verified complaint filed for investigation under the
26   provisions of this part to be served . . . .
      (c) Service shall be made at the time of initial contact with the person, employer, labor
27   organization, or employment agency or the agents thereof, or within 60 days, whichever first
     occurs. At the discretion of the director, the complaint may not contain the name of the
28   complaining party unless the complaint is filed by the director or his or her authorized
     representative."  CAL. GOV'T CODE § 12962.

1   only jurisdictional service requirement in such "non-investigatory" circumstances was the one-

2   year requirement set forth in section 12962(b).  *Id.* at 673.

3          Other courts have adopted the reasoning of *Wasti* and found that failure to comply with the

4   requirements of section 12962 does not bar a civil claim when a plaintiff elects to obtain a right-

5   to-sue letter, and not an investigatory complaint, from the DFEH.  *See Greenwald v. Bohemian*

6   *Club, Inc.*, No. C07-05261 WHA, 2008 WL 2331947, at *4 (N.D. Cal. June 4, 2008) ("Because

7   plaintiff did not submit her claim for investigation and immediately sought a right-to-sue letter,

8   her failure to timely serve defendants notice did not operate as a jurisdictional bar"); *Monaghan v.*

9   *El Dorado Cnty. Water Agency*, No. 2:10-CV-00434-MCE, 2012 WL 397769, at *6 (E.D. Cal.

10  Feb. 7, 2012).[5]

11         Unisys relies on *Greenly v. Sara Lee Corp.* to argue that a plaintiff must serve an

12  administrative complaint on a defendant within the 60 day period in section 12962, regardless of

13  whether he seeks investigation or a right-to-sue.  Unisys Reply 2 (Dkt. No. 119).  In *Greenly*, the

14  court did not consider the plaintiffs' FEHA claim because the plaintiffs failed to properly file any

15  verified complaint with the DFEH prior to bringing the lawsuit.  *Greenly*, 2008 WL 1925230, at

16  *13.  *Greenly* indicates that an employee must file *some* kind of administrative complaint with the

17  DFEH, whether a request for investigation or for a right to sue letter, "in order to be entitled to file

18  a civil action in court."  *Id.*  It does not address *Wasti* or provide support to contravene the other

19  cases to have discussed this question.

20         I find that Saba's failure to serve Unisys with his non-investigatory administrative

21  complaint does not bar him from bringing his CFRA claim based on section 12962.

22  **C.  Saba Failed to Raise a Triable Issue of Fact in his First Three Causes of Action that**
    **he was Terminated Unlawfully in Retaliation**

23

24      **1.  Saba Demonstrated a Prima Facie Case for his First Three Causes of Action**

25      In order to defeat Unisys's motion for summary judgment, Saba must first make out a

26  _____

27  [5] Unisys's argument that *Wasti* is distinguishable because the plaintiff in Wasti was unrepresented
    is not persuasive.  *See* Unisys Mot. 13; Unisys Reply 2 (Dkt. No. 119).  *Wasti* did not make its
    determination based upon the fact that the plaintiff was unrepresented, and courts since *Wasti* have
28  rejected arguments that its reasoning applies only to unrepresented plaintiffs.  *See Greenwald*,
    2008 WL 2331947, at *4.

United States District Court
Northern District of California

prima facie case for each cause of action.  *Faust v. California Portland Cement Co.*, 150 Cal. App. 4th 864, 885 (2007).  Once he does so, the burden shifts to Unisys to show that there was "a legitimate, nonretaliatory reason for the adverse employment action."  *Id.* (internal citations omitted).  If Unisys satisfies this requirement the burden shifts back to Saba to prove that this reason is merely a pretext.  *Winarto v. Toshiba Am. Electronics Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001).  Some courts refer to this burden shifting as the "*McDonnell Douglas*" analysis.  *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1143 (9th Cir. 2003).  Saba's first three causes of action follow this basic framework.

      a.   CFRA claim

To establish his third claim for retaliation in violation of the CFRA, California Government Code section 12945.2, Saba must show that "(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA leave."  *Faust*, 150 Cal. App. 4th at 885; *see also Rogers v. Cnty. of Los Angeles*, 198 Cal. App. 4th 480, 491 (2011).

Neither party disputes that Unisys is an employer covered by the CFRA.  In addition, Saba exercised his right to take leave at least twice, in 2012 and in January 2013, and submitted the formal requests as evidence.[6]  *See* Saba Exs. 11, 14, 20.  Construing the evidence in the light most favorable to Saba, a jury could conclude that Unisys terminated Saba in retaliation for the exercises of his right to take family medical leave.  I make this determination this in light of (i) Hartzler's statement that taking leave would make it difficult for Saba to be involved at work, (ii) Hartzler's attempts to force Saba to take full-time leave instead of part-time leave; and (iii) the temporal proximity between Saba's exercise of his right to take leave in late 2012 and 2013, his poor evaluation in late 2012, and his termination in 2013.  Taken together, these establish a prima

---

[6] The parties dispute whether Saba's other requests for leave qualify under the CFRA.  *See* Unisys Mot. 14.  I need not address each purported request for leave separately because Saba undisputedly requested and received leave twice.

facie case of wrongful termination.  *See Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1110 (2007) (plaintiff's "averment raises a factual issue of whether she engaged in protected conduct that was temporally close to and preceding the adverse employment action, which sufficed to shift the burden to" defendant).

  b. Retaliation in violation of public policy

   To establish a prima facie case for retaliatory employment termination in violation of public policy, known also as a *Tameny* claim, courts apply an inquiry similar to that governing CFRA claims.  *Loggins*, 151 Cal. App. 4th at 1108-09.  The plaintiff must first establish that (i) he engaged in a protected activity; (ii) the employer subjected him to an adverse employment action; and (iii) there is a causal link between the protected activity and the adverse employment action. *Id.*  "To bring a *Tameny* claim, a plaintiff must tether the public policy allegedly violated to some statutory or constitutional provision."  *Threadgill v. Mclane/Suneast, Inc.*, No. EDCV 14-2269 JGB SPX, 2015 WL 114203, at *5 (C.D. Cal. Jan. 8, 2015).

   Saba's first and second causes of action both assert *Tameny* claims for retaliation on two bases:  Saba's prior lawsuit, and Saba's "whistleblowing" about the TASC backup failures.[7]  Saba bears the burden of identifying the specific statute or regulation upon which his claims are based. *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1189 (C.D. Cal. 2013).  Courts in California have determined that "public policy cases fall into one of four categories:  the employee (1) refused to violate a statute; (2) performed a statutory obligation; (3) exercised a constitutional or statutory right or privilege; or (4) reported a statutory violation for the public's benefit."  *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 76 (1998).  "[T]o be actionable, the discharge must violate a policy that is (1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) 'substantial' and 'fundamental.'"  *Diego v. Pilgrim United Church of Christ*, 231 Cal. App. 4th 913, 921 (2014) (internal citations omitted).

---

[7] Although Saba frames his first cause of action as a whistleblowing claim, the allegations illustrate that Saba actually brings a cause of action for retaliation in violation of public policy, with the public policy relating to Saba's "whistleblowing" conduct.  Compl. ¶¶ 26-35.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Saba asserts that his exercise of statutory rights under California labor laws by filing a

2    lawsuit implicate a fundamental public policy.  Saba Oppo. 21.  Unisys does not argue that the

3    previous lawsuit does not implicate a public policy, and I conclude that this requirement is

4    satisfied for Saba's second cause of action.  *See Guidry v. Marine Engineers' Beneficial Ass'n*,

5    No. C 05-03960 CRB, 2007 WL 707511, at *8 (N.D. Cal. Mar. 6, 2007) (public policy implicated

6    by "filing a lawsuit to challenge racial discrimination").

7    For Saba's first cause of action related to whistleblowing, the parties do not agree on

8    whether Saba engaged in conduct protected by public policy.  Although Saba points to several

9    policies that Unisys allegedly violated, I find most persuasive his argument that Unisys's

10   concealment of the data backup failures constituted fraud in violation of California Civil Code

11   sections 1572, 1709, and 1710.  Saba Oppo. 20.  Saba presented evidence that Unisys both knew

12   of a potentially serious backup failure relating to TASC's files, *see* Hartzler Depo. 226:10-227:22,

13   and deliberately attempted to conceal this from TASC.  *See* Trumpler Depo. 149:7-150:6 (Dkt.

14   No. 100).  In fact, Buckner admitted that neither he nor anyone he knew of at Unisys informed

15   TASC of the failing backups.  Buckner Depo. 102:13-25.[8]

16   Unisys argues that the private relationship between it and TASC cannot implicate public

17   policy.  Unisys Mot. 19.  It cites *Hunter v. Up-Right, Inc.* to argue that although "fraud and deceit

18   are defined by statute (see Civ. Code, §§ 1572, 1573, 1709, 1710, 3294), and while fraudulent

19   conduct is generally condemned by society, we cannot agree that the prohibitions embodied in the

20   statutes concern society."  6 Cal. 4th 1174, 1186 (1993).

21   This argument is unpersuasive.  In *Hunter*, the alleged fraud was committed on the

22   employee and was related to his termination.  The court did not discuss fraud committed on others.

23   *See id.* at 1185 ("a misrepresentation *not* aimed at effecting termination of employment, but

24   instead designed to induce the employee to alter detrimentally his or her position in some other

25

26   _____

27   [8] Unisys asserts that because it did not have a contract with the government, it was not subject to
     the legal hold.  Unisys Mot. 19.  This argument misses the mark.  Saba does not claim that Unisys
     was legally obligated to comply with the hold itself; he argues that Unisys's actions of concealing
28   a serious backup issue, which could have legal consequences for its client, violated several public
     policies, including the law prohibiting fraud.

                                                    17

1    respect, might form a basis for a valid fraud claim even in the context of a wrongful termination");

2    *Lazar v. Superior Court*, 12 Cal. 4th 631, 639 (1996) (distinguishing *Hunter*).

3           Other courts have recognized that reporting harm to a private third party's interests

4    implicates public policy for the purposes of a *Tameny* claim.  The court in *Yau v. Santa Margarita*

5    *Ford, Inc.* reasoned that reporting such conduct served "the public interest in deterring crime and

6    . . . the interests of innocent persons who stood to suffer specific harm from the suspected illegal

7    conduct."  229 Cal. App. 4th 144, 157 (2014).  In addition, the court in *Diego v. Pilgrim United*

8    *Church of Christ* concluded that public policy is implicated where "a terminated employee [] was

9    merely perceived by the employer to be a whistleblower."  231 Cal. App. 4th at 923.  The court

10   rejected the contention that no public policy was violated because there was no actual violation:

11   "[O]ne should not assume that the employer's *precise act* . . . must be specifically prohibited for

12   the public policy exception to apply.  All that is required is that the statutory provision sufficiently

13   describe the type of prohibited conduct to enable an employer to know the fundamental public

14   policies that are expressed in that law."  *Id.* at 925 (internal citations and quotations omitted).

15          Here, not only did Unisys allegedly commit fraud and breach of contract, but it also

16   purportedly prevented its client from complying with a legal hold.  *See Saba* Ex. 31 (discussing

17   knowledge of backup problems).  Construing the facts in the light most favorable to Saba, the

18   conduct described in the first cause of action implicates a public policy.[9]

19          Regarding both the first and second causes of action, Saba also established that he was

20   subject to an adverse employment action.  He was laid off.  Finally, as with the CFRA claim, the

21   temporal proximity between Saba's actions and his termination help establish causation for the

22   purposes of making a prima facie case.  Saba's lawsuit with Unisys settled four months before his

23

24   _____

     [9] I note, however, that this is a close question.  While the facts would permit a reasonable juror to
25   conclude that Unisys withheld information from TASC, and that Saba believed this concealment
     violated the law and violated a legal hold order from the DOJ, I am less certain that there are
26   triable issues of fact as to the other elements of fraud.  Unisys provided undisputed evidence that
     by the time it received notice of the legal hold order, the backup problem was resolved.   Trumpler
27   Decl. ¶¶ 11-13 (Dkt. No. 84).  In addition, no *backup* data was ever requested pursuant to this hold
     order, and the data affected by the hold was apparently provided in full.  *Id.* ¶ 15.  For the
28   purposes of this summary judgment motion, however, I assume that Saba has established a prima
     facie case.

termination, and his complaints about TASC occurred within months of his termination. Therefore, Saba met the initial burden of showing a prima facie case for his *Tameny* claims. *See Loggins*, 151 Cal. App. 4th at 1112 ("a plaintiff can satisfy the *initial* burden under the *McDonnell Douglas* framework by producing evidence of nothing more than . . . the proximity in time between the protected action and the allegedly retaliatory employment decision) (internal quotations omitted).

### 2. Unisys Established a Legitimate Reason for Terminating Saba

Because Saba satisfied his initial burden with respect to his first three causes of action, Unisys must demonstrate a legitimate reason for its employment decision. Unisys's reasons for terminating Saba apply equally to the first three causes of action.

Unisys provided several reasons to justify Saba's termination. The primary ones are that: (i) Saba was not able to work for the City, one of the two main customers of Core Team 3, because he did not complete the background check; (ii) the recent contractual change with TASC, the other main customer, substantially reduced the workforce Unisys needed to fulfill the requirements of the contract; and (iii) Unisys implemented a reduction in force including Saba after its corporate earnings fell. *See* Saba Ex. 34.

Saba does not argue that the reasons above are false. It is undisputed that he was not able to serve one of the two main clients of Core Team 3,[10] the client he *could* work for reduced its work with Unisys, and Unisys laid off 54 employees as part of a scale-down effort. These reasons present a valid and reasonable basis for termination. Therefore, Unisys has satisfied its burden of demonstrating a legitimate reason for terminating Saba. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 892 (9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994) (legitimate reason where there was a "decision to decentralize the human resources function, and as a result of this decentralization, [plaintiff's] supervisory duties were assumed by others"); *Martinez v. Puerto Rico Fed. Affairs Admin.*, 813 F. Supp. 2d 84, 99 (D.D.C. 2011) (budgetary concerns sufficient to

---

[10] Although the parties argue at length as to whether Saba was at fault or justified in not obtaining background clearance from the City, the dispute is largely immaterial. The pertinent facts are undisputed: Saba did not obtain clearance, Unisys did not prevent Saba from obtaining the clearance, and Saba consequently was unable to work for the City.

United States District Court
Northern District of California

show legitimate reason for termination).

### 3. Saba has not Met his Burden that Unisys's Justification for Terminating him was a Pretext

Because Unisys established legitimate reasons for terminating Saba, the burden shifts back to Saba to show that these justifications were a pretext for unlawful termination in retaliation for his exercise of his right to take family medical leave, for his prior lawsuit, or for complaining about the TASC backup issues. *See Wallis*, 26 F.3d at 892 ("The presumptions having dropped out of the picture, we are left with the ultimate question of whether [plaintiff] has offered evidence sufficient to permit a rational trier of fact to find that [defendant] acted wrongfully").

Saba claims that Unisys's reasons for laying him off were pretextual. First, he attacks Baker's qualifications, who he concedes was the only other viable member of the team working for TASC who could have been selected for layoff. *See* Saba Oppo. 13-14; Hartzler Decl. ¶¶ 33-34; Wang Decl. ¶ 20. He asserts that he was not "junior" to Baker, as Hartzler stated. Saba Oppo. 13-14. However, while Saba worked for Unisys longer than Baker, he held a lower level job than Baker and had worked with TASC (remotely) for less time than Baker. Saba Depo. at 364:24-365:3.

Saba also asserts that Baker did not have more expertise than him in the primary software used in conjunction with the client's work, VMware, Active Directory, and Print Server. Saba Oppo. 13-14. However, Saba does not provide any evidence of Baker's qualifications. The fact that Baker testified to using VMware only two or three times per year does not mean that she did not have experience in the program. *See* Baker Depo. 28:1-3 (Dkt. No. 100). Neither of these statements by Unisys about Baker was demonstrably false.

Moreover, Unisys contends that it kept Baker "because of her strong knowledge of TASC's operating environment and personnel, as well as her expertise in the key technical areas." Saba Ex. 34. Construing the facts in the light most favorable to Saba, the evidence does not show that Baker was clearly a less valuable employee. She held a higher position at Unisys than Saba, had worked with TASC longer, and was able to work for both Core Team 3 clients. Wang Decl. ¶ 20. There is no evidence that she did not perform her job duties capably. *See id.* ("Ms. Baker had

a higher role code (Saba was a Level 1 and Baker was a Level 2) and provided more complex support than Saba; in addition, she also performed work for the City of Minneapolis"); Hartzler Decl. ¶ 36 ("unlike Mr. Saba, Ms. Baker had always received high performance marks and praise for her work and technical skills from co-workers and customers."); Cilia Decl. ¶ 9 (Dkt. No. 77) ("Baker was a valuable asset to the Windows Engineering team, in particular with regard to the TASC account"); Levenson Decl. ¶ 12. In sum, that Unisys chose to retain Baker does not demonstrate that Unisys's termination decision was false or pretextual.[11] *See Jackson v. Kaplan Higher Educ., LLC*, No. 1:14-CV-00073-AWI, 2015 WL 2095206, at *12 (E.D. Cal. May 5, 2015) ("There is a big difference between providing hard evidence that the reason given by the employer was factually false and merely speculating that a jury armed only with the fact that the employee had complained . . . could find that the reason given by the employer was pretextual.").

Second, Saba contended at the hearing that Unisys presented "shifting explanations" for his termination, citing to *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997). But there is no evidence to support this assertion. The facts show that in her performance evaluations and emails to Saba, Hartzler continuously expressed concern that Saba was unable to work for the City, a key reason for his eventual termination. Therefore, Saba's reliance on *Payne* is misplaced.

Saba also attacked Hartzler's truthfulness by pointing to her inconsistencies in whether she took family medical leave. Tr. 10:6-21 (Dkt. No. 130). This testimony does not undermine Hartzler's overall credibility, nor does it bear on any material issues in the case. Further, it is unclear whether Hartzler made a mistake at all in this testimony. *Compare* Hartzler Decl. ¶ 43 ("I have taken leave from Unisys" to care for children), *with* Hartzler Depo. 52:17-19 (never taken "*family* medical leave" while working for Unisys) (emphasis added).

Third, Saba argues that proof of pretext for unlawful retaliation is found in the May 9, 2013 email that he sent to Greene. When construing all of the facts in the light most favorable to Saba, it is doubtful that a reasonable jury would conclude that Greene even received the email.

---

[11] Although Saba argues that his job duties got worse after he exercised his right to take family medical leave, he admitted in his deposition that between January 27, 2012 and his termination his salary was not reduced, his title was not changed, he remained on the same team, and his benefits were not reduced. Saba Depo. 375:21-376:21.

Saba's proof to the contrary is that he sent the email and that he did not receive a bounce-back email. However, he does not explicitly contend that any Unisys employee actually received the email and ignored it. Saba's deposition testimony contradicts his declaration: while Saba says he did not receive any bounce-back or response, he testified during his deposition that he received an automatic response from Rusek that Rusek had left Unisys. Saba Depo. 268:7-21. Moreover, Unisys has presented substantial evidence that the May 9, 2013 email was never received and did not play any role in Saba's termination decision. *See* Greene Decl. ¶ 14 (stating that he has no record of Saba's email, never received it, and did not read it until this litigation); Ellis Decl. ¶ 5 (stating that there is no record of the May 9 email in the "audit mailbox" kept by Unisys in Saba's account or Greene's account); Hartzler Decl. ¶ 38.

But assuming that Greene received this email, Saba does not present any other facts or evidence that would support a finding that Unisys terminated Saba because of this email, instead of the other valid reasons that Unisys presented. Hartzler testified that she knew of Saba's lawsuit against Unisys "sometime in the second half of 2012," but that she did not know the specifics of it. Hartzler Depo. 193:24-194:21.[12] While Saba claims that Hartzler knew of all of the information in the email, he has not provided any evidence that it was the reason for his termination and that the other reasons were a pretext.

Finally, Saba makes several arguments to the effect that he was performing his job well and did not need to be terminated. However, Unisys has presented undisputed evidence that it was forced to lay off employees due to declining revenues. As reflected in plaintiff's counsel's argument at the hearing, Saba's evidence demonstrates, at best, that Unisys *could have* terminated someone else or that they *could have* retained Saba to do a different job. This argument ignores the fact that in making such reductions in force, companies are often faced with difficult choices that are not actionable. It does not demonstrate that Unisys's reasons for terminating Saba were false or pretextual.

---

[12] Although Saba points to this time frame in arguing that Hartzler changed her performance review based on this knowledge, many of Hartzler's concerns in Saba's 2012 performance review were also expressed in her 2011 performance review and in prior communications. *See*, e.g., Dkt. No. 82-1; *see also* Hartzler Decl. Ex 30.

1    Saba largely relies on the strength of his prima facie case to argue pretext, but a prima facie

2    case alone cannot demonstrate that a legitimate reason for termination was pretextual.  *See*, e.g.,

3    *Heath v. Ohio Tpk. Comm'n*, 85 F. App'x 494, 498 (6th Cir. 2004) ("If the prima facie case alone

4    allowed a jury to infer pretext, then "[n]o case could ever be culled out after the prima facie

5    stage."); *Jackson*, 2015 WL 2095206, at *12 ("Plaintiff must make "an affirmative showing of any

6    evidence to show that Defendant's reason for her termination was pretextual"); *Loggins*, 151 Cal.

7    App. 4th at 1113 ("an employee seeking to avoid summary judgment cannot simply rest on the

8    prima facie showing, but must adduce substantial additional evidence from which a trier of fact

9    could infer the articulated reasons for the adverse employment action were untrue or pretextual.");

10   *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319 (4th Cir. 2005).

11       Here, Unisys's reasons for termination are strong and unrebutted:  Saba was unable to

12   work for the City, there was change in the amount of work needed for TASC, he occupied the

13   lower level position on the team working with TASC, and Unisys implemented widespread

14   reductions in force as a result of financial reversals.  *See Davis v. City of Seattle*, 343 F. App'x

15   230, 233 (9th Cir. 2009) ("Even if [plaintiff] had established a weak issue of fact as to pretext,

16   summary judgment was proper because she presented no more than [t]he mere existence of a

17   scintilla of evidence, and [defendant] presented a strong reason to justify its actions, and no

18   rational trier of fact could conclude [defendant's actions were discriminatory or retaliatory.").

19       There is no basis in the evidence to conclude that Unisys's reasons were pretextual.

20   Accordingly, I GRANT Unisys's motion for summary judgment on the first three causes of

21   action.[13]

22

23

---

24   [13] In finding a lack of pretext, I need not rely upon the evidence presented by Unisys in support of
     its motion for summary judgment, which indicates that Saba had been placed on the layoff list and
25   subsequently removed twice prior to his termination, in early 2011 and then in November 2012.
     Thiel Decl. ¶¶ 7-9 (Dkt. No. 78).  Although Saba does not contest this fact, which seriously
26   undermines his argument for a temporal nexus between his protected acts and his termination,
     even without such evidence Unisys has established a legitimate reason for termination and Saba
27   has failed to demonstrate that this reason was pretextual.  *See Benz v. Clorox Co.*, No. 13-CV-
     01361-WHO, 2014 WL 1366299, at *8 (N.D. Cal. Apr. 7, 2014) ("The supposed evidence of
28   pretext does not address the unrebutted deficiencies identified in [plaintiff's] performance and is
     not sufficient to survive summary judgment.").

## II.    SABA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Because I grant Unisys's motion for summary judgment on all counts, Saba's motion for partial summary judgment is DENIED as moot, as is Unisys's request for judicial notice filed in connection with its opposition to this motion. *See* Dkt. No. 106.  However, I note that Saba's motion would certainly fail on the merits.  Saba moves for summary judgment on two of Unisys's affirmative defenses: the "after-acquired evidence" defense, and the "unclean hands" defense. Saba Mot. at 4-5 (Dkt. No. 75).  It acknowledges that Unisys made the same eight factual assertions for both defenses.  *Id.* at 6.  There are clearly triable issues of fact as to assertions (3), (4), and (7).[14]

First, a triable issue of fact exists that Alquero was Saba's wife at the time he worked for Unisys.  Saba potentially committed the crimes of fraud and/or bigamy, which in turn would create a triable issue of fact to support Unisys's affirmative defenses.  *See Palmquist v. Shinseki*, 729 F. Supp. 2d 425, 430 (D. Me. 2010) ("benefits fraud" presents triable issue of fact to be resolved by a jury).  If proven, a rational trier of fact could conclude that Saba would be terminated if Unisys had known of hid fraudulent requests for benefits for a person who was not his spouse.

Similarly, a triable issue of fact exists that (i) Saba operated a personal business while he was employed by Unisys and (ii) that Unisys would have terminated Saba if it had known of this other business.  In arguing that Saba never operated or participated in running any business while working at Unisys, Saba relies on facts that are disputed.  Unisys submitted evidence of substantial earnings that Saba received from sources other than Unisys during the time that Saba worked there.  Unisys Oppo. 9 (Dkt. No. 102).  One source was Quest Software, arguably a competitor of Unisys.  *Id.*  Given these facts alone, there is a triable issue of fact as to whether Unisys would have fired Saba for a violation of its internal policies that counsel employees to avoid conflicts of

---

[14] Unisys's third assertion in support of its defenses is that "Saba failed to provide Unisys with accurate and up-to-date information regarding his spouse(s)/marriage(s) in violation of Unisys' policy."  Saba Mot. at 6.  Its fourth is that "Saba *may have* sought and/or obtained benefits from Unisys for or related to a purported spouse who was not in fact a legal spouse," and its seventh is that Saba operated a "personal business" while he was employed by Unisys in violation of corporate policy.  *Id.*

1    interest, obtain prior approval for all outside employment, and prohibit working to the detriment of

2    tasks at Unisys.  *See id.* at 11.

3    **CONCLUSION**

4            For the above reasons, Unisys's motion for summary judgment is GRANTED.  Saba's

5    motion for partial summary judgment is DENIED.

6            Two weeks after the motions for summary judgment were submitted at oral argument,

7    Saba filed a substitution of counsel form and requested a temporary stay.  In light of this Order,

8    Saba's request for a temporary stay is DENIED as moot.  Dkt. No. 134.

9            Judgment shall be entered in accordance with this Order.

10           **IT IS SO ORDERED**.

11   Dated: July 17, 2015



WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

25